STATE of Tennessee, Petitioner,

v.

Willie SANDERSON, Respondent.

Supreme Court of Tennessee.

Feb. 7, 1977.

R. A. Ashley, Jr., Atty. Gen., Robert A. Grunow, Asst. Atty. Gen., Nashville, for petitioner.

Charles S. Kelly, Dyersburg, for respondent.

OPINION

HENRY, Justice.

We granted certiorari in this criminal action to examine and construe the meaning and intent of the "valid prescription" exception to Sec. 52–1432(b) T.C.A., relating to the possession of a controlled substance and constituting a part of "The Tennessee Drug Control Act of 1971." Sec. 52–1408, et seq., T.C.A.

The Court of Criminal Appeals reversed the trial court, holding that the substance possessed by the defendant was "obtained by means of a valid prescription."

I.

The controlled substance consisted of twenty-two tablets of tenuate dosepan—(diethylpropion hydrochloride). Tenuate Dosepan is an anorectic commonly used in the control of obesity, and diethylpropion is a Schedule IV substance under Sec. 52–1419, T.C.A.

On December 9, 1974, the defendant contacted Dr. Landrum Tucker, a practicing physician in Ripley, and asked him to issue a prescription for diet pills for her sister, Mae Turner, who lived in Gary, Indiana, but who was visiting with her in Ripley. The sister was not present, had never been a patient of Dr. Tucker, and, he had never seen her. The Doctor complied by writing a prescription to Mae Turner. Two days later defendant and a companion presented the prescription at a local drugstore and obtained thirty tablets of this medication.

Later on the day of issuance, defendant and her companion went to a Ripley beer joint where she gave the bottle containing twenty-two tablets to the operator. In a subsequent police raid these pills were confiscated, along with other contraband drugs. In a trash can inside the premises police found the label affixed by the pharmacist. Ample material evidence supports the purchase and the possession by the defendant.

The testimony of Dr. Tucker borders on being incredible. He wrote the prescription to Mae Turner at the request of the defend-

ant, one of his regular patients, and gave it to her. He stated that "quite a few people will come in and ask for reducing tablets or they call on the telephone. . . . I usually just call the drug store and tell them to give them a reducing tablet, tenuate doespan (sic)". Further he said "if they want the tablets, I give it to them." Further he testified, "I write reducing tablets to 30 or 40 people a month and *I don't see them.*"

The following from his testimony is significant:

Q. This is not what you call a narcotic?

A. It's certainly not a narcotic, as far as I know. *I don't know anything about these drugs.* That's just what the salesmen come in and tell me. They told me this was not a class IV drug.

Q. Doctor, why would somebody want this drug, say that was not overweight?

A. *I don't know of any reason they'd want that drug.* I don't know anything else it does. Of course, they bring all these drugs on the market and *I don't know anything about it. All I know is what the drug salesmen tell me.* They say the drug salesmen run the medical practice. They do in a way. (Emphasis supplied).

It is a prescription issued by this doctor and under these circumstances that we are asked to validate. We don't know where he has been in recent years with common street talk about "uppers". Any good "detail man" for any reputable drug company could enlighten him as to the use made of "diet pills" for purposes other than weight control.

The 1975 issue of Physicians' Desk Reference, commonly called the PDR, is in universal use by the medical profession and pharmacists throughout the nation. It sets out a complete description of Tenuate Dosepan, contraindications, warnings, precautions and dosages. From an examination of this authoritative and standard treatise we are unable to comprehend the action of any physician in prescribing a drug specifically made unlawful, except by prescription, on a "sight unseen" basis. We do not accept such conduct as a sound medical practice and we consider it contrary to the public interest.[1]

We note that Sec. 63–618, T.C.A., relating to denial, suspension, or revocation of a physician's right to practice, includes as a ground, in addition to unprofessional conduct and gross negligence the following:

Dispensing, prescribing, or other distributing any controlled substance or any other drug not in the course of professional practice or *not in good faith* to relieve pain and suffering or not to cure an ailment, physical infirmity or disease. (Emphasis supplied).

Under his own version of the facts surrounding the issuance of this prescription, this doctor was guilty of gross negligence and was not motivated by good faith. It is the clear intent of the Drug Control Act that a prescription for a controlled substance is lawful only if issued for a legitimate medical purpose. This prescription was not so issued.

## II.

To this point it might appear that we are visiting the sins of the doctor upon this defendant, and so we would be, had she acted in good faith. She did not.

She represented to the doctor that her sister from Gary had a weight problem. In point of fact her sister was five (5) feet and eight (8) inches tall, and weighed 115 pounds. She was what we would commonly call "skinny" and certainly had no legiti-

1. Sec. 52–1435(a)(1) reads as follows:
   (a) It is unlawful for any person:
   (1) who is subject to §§ 52–1424—52–1431 to distribute or dispense a controlled substance in violation of § 52–1431 or to distribute or dispense any controlled substance for any purpose other than those authorized by and consistent with such persons professional or occupational licensure or registration law, or to distribute or dispense any controlled substance in a manner prohibited by such persons professional or occupational licensure or registration law; . . .
   See also Sec. 52–1432, T.C.A.

mate use for diet pills. The average woman of her height and age weighs 155 pounds, according to a study made by the Society of Actuaries. See 1976 World Almanac, Newspaper Enterprise Association, p. 964. See also L. Dublin, Factbook on Man: From Birth to Death, page 358. The desirable weight according to Metropolitan Life Insurance Company for a woman of her age ranges from 129 for a small frame woman through 158 for a large frame woman. See R. Clark, Book of Health—A Medical Encyclopedia for Everyone, (Third Edition 1973), page 900. Viewed from any standard this "fat lady" weighs a minimum of 40 pounds less than the average woman of her age and height, and 14 pounds less than her desirable weight, assuming a small frame.

Defendant did not call her sister as a witness. Quite aside from the well known inference arising from the failure of a party to produce a witness who has peculiar knowledge of the facts and would naturally favor the party's contention,[2] is the fact that this sister was not even pointed out in the courtroom so that the jury might have observed first-hand whether she was in need of dietary aids for control of obesity. The record does not show that she was present in court.

The pills did not reach the sister but were left on deposit at a beer joint with the label removed. This was a clear indication that they were procured by fraud and were never designed for any legitimate purpose.

We think it clear, that it was the intent of the legislature in making an exception in favor of controlled substances obtained by "a valid prescription" to provide a complete defense in those cases where the prescription was issued in good faith. Conversely we do not believe the legislature had any intention of placing a protective cloak around anyone who procures a prescription with no intent to deliver it to the ultimate consumer or who procures it by fraud, misrepresentation or deceit.

Section 52–1436(a), T.C.A., makes it unlawful for any person knowingly or intentionally:

> (3) to acquire or obtain or to attempt to acquire or attempt to obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge.

The defendant, while not so charged, stands in violation of this statute and it is applicable not only as shedding light on the legislative intent but also, when read in connection with the earlier sections (52–1432) under which she was indicted, it buttresses our conclusion that the possession was unlawful.

We hold that the prescription issued to Mae Turner was not a "valid prescription" under the exception incorporated in Section 52–1432(b), T.C.A.

### III.

This is a question of first impression in this jurisdiction in that there have been no reported cases decided under Section 52–1432(b). However, not cited in either brief or by the Court of Criminal Appeals, is the case of *Duke v. State,* 211 Tenn. 629, 366 S.W.2d 913 (1963) which we cannot ignore.

Duke was indicted and convicted under Section 52–1303, T.C.A. which was repealed by The Tennessee Drug Control Act of 1971 (Section 52–1408, T.C.A., et seq). At the time of Duke's conviction, then Section 52–1308 T.C.A. permitted a physician acting in good faith to prescribe narcotic drugs and Section 52–1312, T.C.A. made it lawful to possess such a drug "in the container in which it was delivered to him by the person selling or dispensing the same."

The drugs were possessed in *Duke* pursuant to prescriptions issued by reputable physicians, but unquestionably obtained by deceit and misrepresentation. Former Chief Justice Burnett, writing for the Court in *Duke,* said:

2. See D. Paine, Tennessee Law of Evidence (1974), pages 45–46, and Tennessee Cases cited therein.

[T]here is no showing in the first place what these three vials or little bottles that this man possessed contained. In the second place, it is shown by the preponderance of the evidence that whatever it was had been prescribed by a physician . . .. The clear inference . . . is that these three vials which this man had were the same containers in which they were sold to him . . .. Thus it is that . . . the violation of the Section under which he was convicted of possessing is satisfied by the fact that the drugs he possessed were lawfully in his possession through these prescriptions and in the containers in which they were given him when he purchased the drugs. 211 Tenn. at 632, 366 S.W.2d at 914.

We do not consider this holding, under the former law, to be currently authoritative.

The federal law, as set forth in the opening sentence of 21 U.S.C.A. Sec. 844, is virtually identical with Sec. 54–1432(b), T.C.A. Each excepts from criminal sanctions the possession of otherwise unlawful drugs issued "pursuant to a valid prescription."

This federal statute came under the scrutiny of the District of Columbia Circuit in *United States v. Forbes,* 169 U.S.App.D.C. 217, 515 F.2d 676 (1975), wherein the defendant contended that his possession of controlled substances (diet pills) was legal because obtained by two other persons pursuant to valid prescriptions from a physician. The defendant's girlfriend testified that the tablets in the vial containing her name had been obtained by her from a medical prescription for "a loss of appetite" and that she left them with the defendant to return to the doctor because they made her "dizzy." In rejecting the defendant's contention, the Court said:

To construe the statute as appellant suggests would legalize possession of a quantity of controlled substance by *any* person who subsequently acquires it as long as it was originally validly obtained by prescription. Such a construction would even make the labels a defense in the case of possession by a thief or *possession obtained by fraud.* (Second emphasis supplied).

\*      \*      \*      \*      \*      \*

Obviously, this construction would create a loophole in the statute of such magnitude as to render its effective enforcement practically impossible. It would be *absurd* to hold that Congress intended that section 844(a) should be construed so as to produce such a result. (Emphasis supplied). 515 F.2d at 679–80.

And so with our statute, it would be an absurdity to hold that the legislature intended that a criminal defendant, by the procurement of a prescription by fraud and misrepresentation, could clothe himself with the authority to possess drugs which would otherwise be unlawful.

In summary we hold that the "valid prescription" exception is only applicable when the prescription is issued by a licensed practitioner, acting in good faith and in accord with accepted medical standards and when the person obtaining the prescription is also acting in good faith and is free from fraud, deceit or misrepresentation. A "valid prescription" presupposes ethical and prudent conduct on the part of the practitioner and honest motivation on the part of the patient. These essentials are lacking in this suit.

Reversed.

COOPER, C. J., and FONES, BROCK and HARBISON, JJ., concur.

BROCK, Justice, concurring.

I concur in the decision of the Court but not in its rationale. I do not agree that the prescription used by the defendant was not a valid one. On the contrary, it was issued by a physician and was regular and valid in all respects and its validity enabled her to procure the drugs in question from the pharmacist. Although the use of "misrepresentation, fraud, forgery, deception or subterfuge" to obtain possession of a controlled substance is itself made an offense by T.C.A. § 52–1436(a)(3), nothing in the Act provides that an otherwise valid pre-

scription is rendered "invalid" because it was procured by means which are denounced by T.C.A. § 52–1436(a)(3). See *Duke v. State,* 211 Tenn. 629, 366 S.W.2d 913 (1963).

In this case, the defendant is not charged with a violation of T.C.A. § 52–1436(a)(3); she is charged with possession of a controlled substance which is made unlawful by T.C.A. § 52–1432(b) "unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of his professional practice . . .."[1] To make out a defense under the quoted portion of T.C.A. § 52–1432(b), not only must a valid prescription have been used to obtain the controlled substance from the pharmacist, but the defendant's possession of the controlled substance must have been "pursuant to" that prescription. I would hold that although the prescription in this case was valid, the defendant's possession of the controlled substance was not "pursuant to" that prescription.

Construed in light of the evident legislative intent to exempt only possession for bona fide medical purposes, I would hold that the words "pursuant to a valid prescription" authorize possession only by the patient named in the prescription as the intended ultimate user or by the duly authorized agent of such patient who, in possessing the substance is *carrying out the purpose of the prescription,* e. g., a relative or friend of a patient who takes a valid prescription to a pharmacy, obtains the medication and takes it home to the patient. *U.S. v. Forbes,* 169 U.S.App.D.C. 217, 515 F.2d 676 (1975). In the case at bar, the defendant was not the patient named in the prescription as the intended ultimate user nor did she possess the pills as an agent of the intended ultimate user named in the prescription and as a bona fide means of carrying out the purpose of the prescription. Therefore, the defendant's possession was not "pursuant to" the prescription.

1. The comma between the words "to" and "a" is obviously misplaced and should be placed between the words "of" and "a," the meaning being that lawful possession of a controlled

Accordingly, I concur in the reversal of the judgment of the Court of Criminal Appeals.

substance must be obtained either directly from a physician or from a pharmacist pursuant to a valid prescription or order of a physician.