# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs May 20, 2015

## STATE OF TENNESSEE v. EUGENE BERNARD CUDDY, III

**Appeal from the Criminal Court for Sullivan County**
**No. S60204     R. Jerry Beck, Judge**

_____

**No. E2014-01724-CCA-R3-CD – Filed November 23, 2015**

_____

Defendant, Eugene Bernard Cuddy, III, was indicted in a three-count indictment by the Sullivan County Grand Jury for possession of Oxycodone, a Schedule II controlled substance, with intent to sell or deliver, possession of drug paraphernalia, and possession of Alprazolam, a Schedule IV controlled substance, with intent to sell or deliver. Defendant filed a motion to suppress evidence seized during a search of Defendant's person. Following a hearing, the trial court denied Defendant's motion to suppress. Defendant was convicted as charged. The trial court sentenced Defendant to an effective sentence of seven years' incarceration. In this appeal as of right, Defendant contends that: 1) the trial court erred by denying Defendant's motion to suppress; 2) the evidence is insufficient to sustain his convictions; 3) the trial court erred by instructing the jury that it could infer Defendant's intent from the amount of controlled substances Defendant possessed; and 4) the trial court abused its discretion in sentencing Defendant. Having reviewed the entire record and the briefs of the parties, we find no error. Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Stephen M. Wallace, District Public Defender; and Andrew J. Gibbons, Assistant Public Defender, Blountville, Tennessee, for the Appellant, Eugene Bernard Cuddy, III.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Barry Staubus, District Attorney General; and Joshua Parsons, Assistant Public Defender, for the Appellee, State of Tennessee.

# OPINION

## *Motion to suppress*

On October 24, 2011, Kingsport Police Officer Scott Denney responded to a robbery call at the Red Roof Inn in Kingsport. When he arrived, he saw Defendant bleeding from his head and face. Officer Denney testified that Defendant was coherent. Defendant told Officer Denney that he had been robbed at gunpoint by a female and two males. Officer Denney testified that he believed "there was something more to it" because Defendant's account of what happened was inconsistent with that of witnesses to the event. Defendant told Officer Denney that a female knocked on his motel room door, and Defendant thought she was there to clean the room, so he opened the door for her. Two men came into the room with her. One of the men hit Defendant in the face with a pistol. Defendant had multiple wounds on his face and the back of his head.

Sergeant Sean Chambers also responded to the scene. Defendant told Sergeant Chambers that the assailants knocked on the door to his motel room, and when Defendant opened the door, they forced their way into his room, assaulted him, and bound his hands with duct tape. Defendant stated that he did not know anyone in Kingsport, and it was a random act. Sergeant Chambers was skeptical of Defendant's story because he did not recall in his experience in law enforcement a random robbery at a motel. Defendant was coherent. Sergeant Chambers asked Defendant when he had last taken illegal drugs, and Defendant answered that he did not use illegal drugs or drink alcohol. Sergeant Chambers asked Defendant for consent to search his person, and Defendant consented. Sergeant Chambers did not handcuff or otherwise restrain Defendant. Sergeant Chambers found a plastic bag containing smaller plastic bags inside Defendant's coat pocket. During the search, Defendant reached for his crotch area. Sergeant Chambers testified that he feared for his safety because he did not know whether Defendant had a weapon in his possession. Sergeant Chambers took Defendant to the ground. He saw that Defendant was holding in his right hand a plastic bag containing individually packaged pills. Sergeant Chambers placed Defendant under arrest, and Defendant was transported to the hospital for medical treatment of his wounds.

Bradley Mayes, a front desk clerk at the Red Roof Inn at the time of the incident, testified that he found Defendant in his room screaming, "Help!" The door was open and the "room was a wreck." Defendant was "bloodied [and] beaten." Defendant had duct tape on his neck, his wrists, and his ankles. Mr. Mayes testified that Defendant appeared to be "totally dazed," and he was "not really" coherent. Mr. Mayes told Defendant that he was going to call 911 and that Defendant needed to go to the hospital, and Defendant responded, "no, no, no, no" and told Mr. Mayes that he would take himself to the hospital.

Defendant testified at the hearing that he was robbed at gunpoint in his motel room on October 24, 2011. He testified that his attackers put duct tape over his mouth and around his hands and feet and repeatedly hit him in the face and head with a pistol. Defendant lost consciousness. When he regained consciousness, he removed the duct tape and called for help. He testified that he ran out of the room, "trying to chase them down." Defendant did not remember giving his consent to Sergeant Chambers to search him. Defendant testified that he was giving Sergeant Chambers a description of his attackers when Sergeant Chambers "reached out and grabbed [him], put his hands on [him]. And [Defendant] pulled away from him. And then [Sergeant Chambers] slammed [Defendant] to the ground" and handcuffed him.

At the conclusion of the hearing, the trial court found that Defendant "appeared to be acting rationally when Officer Denney took his oral statement about the robbery, and when Mr. Mayes talked to him. He appeared to be acting logically." The court noted that although Mr. Mayes testified that Defendant did not appear to be coherent, "[Mr. Mayes] did have a conversation with [Defendant], again all showing an awareness of his surroundings, what had happened, and that the police had been called and what-have-you." The court noted that Defendant's statements to Mr. Mayes, Officer Denney, and Sergeant Chambers were consistent. The trial court rejected Defendant's argument that he did not have the capacity to consent to a search and found that despite his injuries, "Defendant did have the capacity based on overall evidence."

The trial court accredited Sergeant Chambers' testimony that he obtained Defendant's consent to conduct a search of Defendant's person. The trial court noted that Sergeant Chambers was unequivocal in his testimony, and Defendant "was vague in his remembering what conversation he had with [Sergeant] Chambers." The trial court denied Defendant's motion to suppress.

*Trial*

At trial, Officer Denney testified that he responded to the Red Roof Inn on October 24, 2011. When he arrived, he saw Defendant in the parking lot. Defendant's head and face were bleeding. Defendant had duct tape hanging from his hands and legs. Defendant had refused treatment from EMS workers that were at the scene. Officer Denney testified that Defendant was coherent. Defendant was standing up, and he was steady on his feet. Based on information that Defendant provided to him, Officer Denney called Sergeant Chambers to assist him in the investigation of what had happened. Officer Denney testified that he was standing away from Defendant and Sergeant Chambers, and he could not hear their conversation. Officer Denney saw Defendant and Sergeant Chambers in a struggle, and he went to assist Sergeant Chambers. Sergeant

3

Chambers had Defendant on the ground, and Officer Denney handcuffed Defendant. Officer Denney saw a bag of pills packaged individually in smaller bags. Officer Denney transported Defendant to the hospital for medical treatment.

Sergeant Chambers testified that he was called to the scene by Officer Denney. Sergeant Chambers spoke to Defendant when he arrived. He testified that Defendant had blood on his face, and Defendant "seemed kind of nervous." Defendant told Sergeant Chambers that he had been robbed. Sergeant Chambers testified that he asked Defendant when Defendant last used illegal drugs, and Defendant responded that he did not use illegal drugs or drink alcohol. Sergeant Chambers asked Defendant if he had any weapons on his person, and Defendant replied that he did not. Sergeant Chambers then asked Defendant for consent to search his person, and Defendant consented. Sergeant Chambers found a plastic bag containing other small plastic bags inside Defendant's jacket pocket. Sergeant Chambers asked Defendant again if he had any illegal drugs on his person, and Defendant responded that he did not. Sergeant Chambers continued his search of Defendant, and he noticed that "[Defendant's] hands kept working their way back down towards his crotch area." Sergeant Chambers asked Defendant to keep his arms raised. Defendant again lowered his arm, and Sergeant Chambers again admonished him to keep his arms raised. When Defendant began to lower his arm again, Sergeant Chambers grabbed Defendant's left arm and raised it. Defendant then immediately reached for his crotch area with his other hand, "and it was lightning fast when he moved that arm." Sergeant Chambers "grabbed [Defendant]'s upper torso and took him to the ground." He testified, "on the way to the ground, I noticed that in his right hand he now had a plastic [b]aggie." Sergeant Chambers handcuffed Defendant and removed the plastic bag from his hands.

Detective Daniel Lane was assigned to the Vice and Narcotics Unit of the Kingsport Police Department at the time of Defendant's arrest. He responded to the scene to assist with the investigation of the robbery. Defendant had already been placed under arrest when Detective Lane arrived. Detective Lane testified that officers had removed from Defendant's possession "two pouches of the pills, and then one empty pouch that they were inside[;]" a bag containing five smaller baggies, each containing 20 pills; and a plastic shopping bag containing smaller Ziploc bags and rubber bands. Detective Lane testified that based on his experience, the packaging of the pills in small bags indicated that they were for resale. He testified, "[f]rom the work that I've done, people package their pills like that to be sold."

Tennessee Bureau of Investigation Special Agent Sharon Norman testified that she identified the pills recovered from Defendant as 120 Oxycodone tablets and 19 Alprazolam tablets. Agent Norman noted that the Oxycodone tablets were from two

different manufacturers, and the Alprazolam tablets were also from two different manufacturers.

Defendant did not testify at trial. The parties stipulated that Defendant's pharmacy records be admitted as evidence. The records showed that Defendant had several prescriptions for Oxycodone and Alprazolam filled between 2011 and 2012. The pharmacy records did not contain any information concerning the use and frequency of the drugs. The records showed that on September 6, 2011, approximately seven weeks prior to his arrest, Defendant filled prescriptions for 175 30-milligram tablets of Oxycodone HCL and 60 15-milligram tablets of Oxycodone HCL at a CVS pharmacy in Deland, Florida. On October 5, 2011, approximately three weeks prior to his arrest, Defendant again filled prescriptions for the same quantity and dosages of Oxycodone HCL.

### Sentencing hearing

The presentence report was admitted as an exhibit at the sentencing hearing. Defendant was 35 years old at the time of sentencing. He stipulated his status as a Range II offender. Defendant testified that he had a substance abuse problem. Defendant testified that he had never participated in a drug treatment program. Both of Defendant's parents died when he was a teenager. Defendant did not finish high school. Defendant was diagnosed with HIV after his mother died. Defendant did not begin receiving treatment for HIV until a "couple of months" before his sentencing. Defendant requested that the court sentence him to a drug treatment program. Defendant testified,

> I got to accept any sentence, whatever it is, and prison ain't – I'm not scared to go to prison, obviously, or anything like that. But it's just I don't have – I ain't never been to a treatment program. I ain't even had counseling for being diagnosed [with HIV].
>
> You know what I mean?
>
> So sending me off to prison and going back to prison is just going to be – I – I haven't learned any tools – I – I haven't learned any tools of anything like that where I can maintain out there. So, I mean, sending me right back off to prison really isn't going to – going to do – do much for me. I mean, I know that's – it's probably the inevitable thing that's going to happen, but it's – it's true.

5

Defendant testified that his prescriptions were for arthritis in his back caused by HIV. Defendant testified that he had "never been on pain medication prior to" being diagnosed with HIV.

At the conclusion of the sentencing hearing, the trial court considered the proof at trial and stated that it had considered the presentence report. The trial court ruled, "[t]he [c]ourt's of the opinion [that] probation should not be granted on any sentence I might give." The court found that Defendant had convictions in addition to those necessary to establish his status as a Range II offender. The court also noted Defendant's "special circumstances" and stated,

> The Court's required to consider as part of the rule, what would be just, what would be the best for [Defendant] and the community.
>
> Now, [Defendant] has HIV, which is a very serious condition. Evidently it's under control 'cause he said he's had it for some time. I believe in his testimony, when you asked him about it, been some years he's been diagnosed.

The court also noted that Defendant had absconded to Florida while awaiting trial, and his bond was forfeited. The court considered Defendant's desire "to reform in regards to he does have a drug problem. I think that's beyond question." The trial court imposed sentences of seven years in Count 1, 11 months and 29 days in Count 2, and five years in Count 3, and ordered that Defendant's sentences be served concurrently, for an effective sentence of seven years. The trial court denied Defendant's request for full probation, finding:

> Now, and as previously stated, his prior record, prior revoked violations of probation, outstanding violations of probation, he would not meet the criteria where it would be in his interest or the State's interest or the People's interest that I place him on probation, so probation is denied.

### Analysis

*Motion to suppress*

Defendant contends that the trial court erred in denying his motion to suppress. Defendant argues that his convictions were based on evidence that was seized from him while he was illegally detained. The State responds that the evidence supports the trial court's conclusion that the search was consensual and that Sergeant Chambers'

subsequent detention of Defendant resulted from a reasonable belief, that arose during the consensual search, that Defendant posed a threat.

On appeal from the denial of a motion to suppress, we defer to the trial court's findings of fact unless the evidence in the record preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The "credibility of the witnesses, the weight and value of the evidence, and [the] resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact." *Id.* The prevailing party in the trial court is afforded "the strongest legitimate view of the evidence . . . as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.*

Both the federal and state constitutions provide protections from unreasonable searches and seizures. The general rule is that a warrantless search or seizure is presumed unreasonable, and any evidence discovered by virtue thereof is subject to suppression. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "[T]he most basic constitutional rule . . . is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)); *see also State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997) ("[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.").

Our federal and state courts have recognized three categories of police-citizen interactions: (1) a full-scale arrest, which requires probable cause; (2) a brief investigatory detention, requiring reasonable suspicion of wrongdoing; and (3) a brief police-citizen encounter, requiring no objective justification." *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). "While arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not." *State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006). Even when there is no basis for suspecting criminal activity, an "officer may approach an individual in a public place and ask questions without implicating constitutional protections." *State v. Daniel*, 12 S.W.3d 420, 425 (Tenn. 2000); *see also Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). "'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'" *Daniel*, 12 S.W.3d at 424 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).

7

Defendant asserts that "any consent [he] may have given was involuntary and unreasonable under the Fourth Amendment." "For consent to pass 'constitutional muster,' it must be 'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Cox*, 171 S.W.3d 174, 184 (Tenn. 2005) (quoting *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn. 1998)). "'[T]he existence of consent and whether it was voluntarily given are questions of fact' which require examining the totality of the circumstances." *Id.* at 184-85 (quoting *State v. Ashworth*, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999)). When determining voluntariness, factors to consider include:

> (1) Time and place of the encounter; (2) Whether the encounter was in a public or secluded place; (3) The number of officers present; (4) The degree of hostility; (5) Whether weapons were displayed; (6) Whether consent was requested; and (7) Whether the consenter initiated contact with the police.

*Id.* at 185.

We conclude that the evidence at both the suppression hearing and trial support the trial court's conclusion that Defendant voluntarily gave his consent to be searched. Police responded to an incident in which Defendant was the victim of a crime. Officer Denney was the first officer to respond. He did not draw his weapon or indicate that Defendant was not free to leave. He spoke to Defendant and listened to Defendant's account of what had happened. When Sergeant Chambers arrived, he spoke to Defendant outside of Officer Denney's presence. He also did not draw his weapon or indicate that Defendant was not free to leave. Sergeant Chambers testified that based on Defendant's behavior, Sergeant Chambers asked Defendant for consent to search his person, and Defendant consented. The trial court accredited Sergeant Chambers' testimony that Defendant was coherent and gave his consent to be searched. Defendant's testimony at the suppression hearing was that he did not remember giving consent to be searched. Although one witness who was an employee of the motel testified that Defendant was "not really" coherent, the witness's testimony, as well as the testimony of the two officers who responded to the scene, established that Defendant, though badly beaten, was aware of his surroundings and able to give details about his experience. Considering the above factors, two officers present at the scene, both having responded to an incident in which Defendant was the victim of a crime, neither officer displaying his weapon, and their encounters with Defendant were in a public place and were not hostile, we conclude that Defendant's consent to be searched was voluntarily given.

Defendant argues that he was illegally seized after he "tried to terminate the encounter [and Sergeant] Chambers tackled him and placed him under arrest." Defendant acknowledges that Sergeant Chambers "had the authority to approach and

question [Defendant], he did not have the further right to instruct [Defendant] to raise his arms so that the officer could search him." Defendant argues that he was illegally detained at that point.

We agree with Defendant's assertion that he was seized when Sergeant Chambers made a show of authority by physically raising Defendant's arms. At that point, a reasonable person would have believed that he or she was not free to leave. A consensual police-citizen encounter becomes a seizure, thereby triggering a constitutional analysis of the police action, "when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry*, 392 U.S. at 19 n. 16, 88 S. Ct. 1868. In determining whether a seizure has occurred, the key question is whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave." *Daniel*, 12 S.W.3d at 425.

Now, we must address whether the seizure was reasonable. The State argues that Defendant's behavior during the initially consensual search gave Sergeant Chambers a reasonable suspicion to believe that Defendant posed an immediate threat. Our supreme court has held that "nervous, evasive behavior" by someone may contribute to the conclusion that further investigation is warranted. *Nicholson*, 188 S.W.3d at 661. When Sergeant Chambers began his search of Defendant's person, Defendant failed to follow Sergeant Chambers' requests that he keep his arms raised while Sergeant Chambers conducted the search. Defendant's suspicious movements and behavior caused Sergeant Chambers' to suspect that Defendant might have a weapon. Defendant reached towards his crotch area several times during the search. Based on the totality of the circumstances, Sergeant Chambers had reasonable suspicion to believe that Defendant possessed a weapon and, therefore, was justified in detaining him. *See State v. Winn*, 974 S.W.2d 700, 704 (Tenn. Crim. App. 1998) (noting that reasonable suspicion to justify a search may be based upon "an otherwise inexplicable sudden movement toward a pocket or other place where a weapon could be concealed"). We conclude that the trial court did not abuse its discretion in denying Defendant's motion to suppress. Defendant is not entitled to relief on this issue.

*Sufficiency of the evidence*

Defendant contends that the evidence was insufficient to support his convictions. Specifically, Defendant challenges the sufficiency of the evidence to support the jury's conclusion that the Oxycodone and Alprazolam in his possession were for the purpose of resale. Defendant asserts that the "evidence presented at trial was that [Defendant] was in possession of his own, legitimately prescribed controlled substances and that he had been the victim of a robbery."

9

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.1997). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *Id.* Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Tennessee Code Annotated section 39-17-417(a)(4) provides that it is an offense to knowingly possess a controlled substance with the intent to sell or deliver the controlled substance. Generally, a person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). Oxycodone is a Schedule II controlled substance. T.C.A. § 39-17-408(b)(1)(M). The possession of Oxycodone for resale is a Class C felony. T.C.A. § 39-17-417(c)(2)(A). Alprazolam is a Schedule IV controlled substance. T.C.A. § 39-17-412(c)(1). The possession of Alprazolam for resale is a Class D felony. T.C.A. § 39-17-417(e)(2). A jury may consider the amount of controlled substances possessed and the other circumstances surrounding the arrest to determine whether a defendant's possession of the controlled substance was with the intent to sell or deliver it. T.C.A. § 39-17-419.

Viewing the evidence in a light most favorable to the State, Defendant had in his possession 120 Oxycodone pills separated into smaller bags containing 20 pills each, and he also possessed 19 Alprazolam pills. Defendant also had in his possession a plastic bag

containing smaller Ziploc bags and rubber bands. Defendant did not have in his possession a pill bottle or any documentation showing that the pills were prescribed to him or for his personal use. Detective Lane testified that based on his experience, the packaging of the pills in small bags indicated that they were for resale.

Defendant presented as evidence pharmacy records showing that he had prescriptions for Oxycodone and Alprazolam filled prior to his arrest. Defendant fails to cite in his brief the "valid prescription" exception in Tennessee Code Annotated section 39-17-418(a), which is applicable "when the prescription is issued by a licensed practitioner, acting in good faith and in accord with accepted medical standards and when the person obtaining the prescription is also acting in good faith and is free from fraud, deceit or misrepresentation." *State v. Sanderson*, 550 S.W.2d 236, 239 (Tenn. 1977). Defendant made no such showing at trial. Although Defendant presented evidence of pharmacy records showing that he filled prescriptions for Oxycodone and Alprazolam prior to his arrest, he presented no other medical records or testimony sufficient to invoke the statutory exception. The State presented the testimony of Detective Lane that the packaging of the tablets and the materials used indicated that the pills were intended for resale. The jury was free to weigh the evidence and resolve this question of fact in favor of the State based on the circumstantial evidence.

We conclude that the evidence supports the jury's conclusion that Defendant intended to sell Oxycodone and Alprazolam based upon the packaging and quantity of the drugs. Defendant is not entitled to relief on this issue.

*Jury instruction*

Defendant contends that the trial court erred by instructing the jury that it could infer Defendant's intent from the amount of controlled substance possessed and the other circumstances surrounding Defendant's arrest.

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011). In resolving the issue, this court "must review the entire charge and only invalidate if it, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

Defendant argues that the inference based on the amount of a controlled substance should not apply to prescription medication. Defendant asserts that the jury instruction was misleading to the jury "because the facts of this case, as stipulated by the state,

w[ere] that [Defendant] had a valid prescription for the controlled substances in question that would have included the amounts in [Defendant]'s possession."

Defendant cites no case law to support his position that the inference should not apply to prescription medication and we are aware of none. It is well established that a jury may infer a defendant's intent to sell solely from the quantity of drugs discovered. *See State v. Robert Pruitt*, No. W2010-02269-CCA-R3-CD, 2013 WL 865330, at *3 (Tenn. Crim. App. March 6, 2013). The statute expressly provides: "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." T.C.A. § 39-17-419. There is no distinction made in the statute for prescription medication. The jury was free to draw such an inference. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant contends that the trial court erred by denying any sentencing alternative, and Defendant challenges the length of his sentence. Specifically, Defendant asserts that the trial court should have afforded more weight to his HIV/AIDS diagnosis.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709.

"[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to . . . questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). In determining whether to grant or deny probation, a trial court should consider the circumstances of the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public.

12

*State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). "[T]he burden of establishing suitability for probation rests with the defendant." T.C.A. § 40-35-303(b). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008) (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). A trial judge must consider the following factors before imposing a sentence of incarceration:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1). Additionally, the sentence imposed should be the least severe measure necessary to achieve its purpose, and the defendant's potential for rehabilitation, or lack thereof, should be considered when determining whether to grant alternative sentencing. T.C.A. 40-35-103(4) and (5). Trial judges are encouraged to use alternative sentencing when appropriate. T.C.A. § 40-35-103(6).

In this case, the trial court noted Defendant's eligibility for probation. The court stated that it denied probation based on Defendant's prior criminal history and found that Defendant had prior convictions in addition to those necessary to establish his range. The trial court also considered Defendant's serious medical condition and his drug dependency, but the trial court also noted that Defendant's bond in this case had been forfeited when he absconded from the jurisdiction.

The record shows that the trial court considered the relevant sentencing considerations, and Defendant has not established that the trial court abused its discretion in denying alternative sentencing or "otherwise overcome the presumption of reasonableness afforded sentences [that] reflect a proper application of the purposes and principles of our statutory scheme." *See Caudle*, 388 S.W.3d at 280. Defendant is not entitled to relief.

13

CONCLUSION

For the aforementioned reasons, the judgment of the trial court is affirmed.

_____

THOMAS T. WOODALL, PRESIDING JUDGE